# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2020

Lyle W. Cayce
Clerk

No. 18-50994

DAVID STRATTA; ANTHONY FAZZINO,

Plaintiffs - Appellants

v.

JAN A. ROE, in her individual and official capacity as director of the Brazos Valley Groundwater Conservation District; BILLY L. HARRIS, in his individual and official capacity as director of the Brazos Valley Groundwater Conservation District; BRYAN F. RUSS, JR., in his individual and official capacity as director of the Brazos Valley Groundwater Conservation District; JAYSON BARFKNECHT, in his individual and official capacity as director of the Brazos Valley Groundwater Conservation District; MARK J. CARRABBA, in his individual and official capacity as director of the Brazos Valley Groundwater Conservation District; GORDON PETER BRIEN, in his official capacity as director of the Brazos Valley Groundwater Conservation District; STEPHEN C. CAST, in his individual and official capacity as director of the Brazos Valley Groundwater Conservation District; BRAZOS VALLEY GROUNDWATER CONSERVATION DISTRICT,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

No. 18-50994

Before JONES, SMITH, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A pair of landowners sued the Brazos Valley Groundwater Conservation District ("BVGCD") and its Board of Directors. The BVGCD is a Texas political subdivision whose mission is to manage water resources within its two-county jurisdiction. One of them contends the BVGCD has allowed the City of Bryan to drain groundwater from under his property without compensation, violating the Constitution's Equal Protection and Takings clauses. The other, a Board Member of BVGCD, alleges that the Board deprived him of First Amendment rights by preventing him from speaking at a public meeting. The district court dismissed their claims on the grounds of Eleventh Amendment immunity, ripeness, *Burford* abstention, and qualified immunity. Because the district court erred on all grounds except the dismissal of the First Amendment claim, we AFFIRM IN PART, REVERSE IN PART, and REMAND.[1]

## BACKGROUND

Appellants Anthony Fazzino and David Stratta are landowners with property within the territorial boundaries of the BVGCD. Stratta is also a member of the BVGCD Board of Directors. Fazzino owns 26.65 acres of real property in Brazos County Texas. Under Texas law, Fazzino also owns the groundwater beneath his land, including the groundwater located in the Simsboro aquifer. The City of Bryan, Texas, owns a 2.7-acre tract that is less than 3,000 feet distant from Fazzino's property.

BVGCD is a Groundwater Conservation District ("GCD") created under Section 59, Article XVI of the Texas Constitution and Chapter 36 of the Texas Water Code ("TWC") for the purpose of managing groundwater resources. TEX.

---

[1] Judge Haynes concurs fully in the reasoning as to the takings claim but concurs in the judgment only as to the class-of-one equal protection claim. Judge Jones dissents as to Part III.

WATER CODE §§ 36.0015, 36.011.  GCDs are statutorily tasked with developing groundwater management plans that regulate the production and conservation of water, govern its use, study the quantity of water flowing into and out of the aquifers within their territory, and minimize waste.  Currently, nearly one hundred GCDs cover over 60 percent of the state's land and encompass approximately 72 percent of major and minor aquifers.  The territorial boundaries of 60 GCDs coincide with a single county or less, while the remaining GCDs cover more than one county.  BVGCD's boundaries are coextensive with Robertson and Brazos Counties.

Pursuant to its authority under TWC Chapter 36, BVGCD promulgates rules governing the production of groundwater from the Simsboro formation.  On December 2, 2004, new rules ("Rules") took effect to regulate landowners' production of groundwater by establishing three categories of wells: 1) Existing Wells; 2) New Wells; and 3) Wells with Historic Use.  The rules regulate "groundwater pumpage," i.e., how much water may be withdrawn from a well, through spacing requirements and production limitations.

The spacing and production requirements are designed to "minimize as far as practicable the drawdown of the water table and the reduction of artesian pressure, to control subsidence, to prevent interference between wells, to prevent degradation of water quality, and to prevent waste."  RULES OF THE BRAZOS VALLEY GROUNDWATER CONSERVATION DISTRICT, Rule 6.1(a) (published Dec. 1, 2004).[2]  As water is drawn from a well, it creates a "cone of depression" impact; when more water is withdrawn there is a larger cone of depression.  Rule 7.1 established maximum allowable production regulations for New Wells according to a formula that calculates the "total number of

---

[2] The most recent version of the Rules, amended September 12, 2019, retains that precise language.

contiguous acres required to be assigned to the well site."[3]  The definition of "contiguous acreage" requires that the land be "owned or legally controlled . . . by the well owner or operator," and that the land "shall bear a reasonable reflection of the cone of depression impact near the pumped well, as based on the best available science" and BVGCD's formula.  *Id*. at Rule 1.1(6).  The formula thus requires 649 contiguous acres surrounding a New Well producing 3,000 gallons per minute ("GPM"), which equates to a circle around the well with a radius of 3,003 feet.

Historic Use wells are generally limited to producing the maximum amount of groundwater an owner can prove was beneficially used before the effective date of the new Rules. Rules 1.1(16), 8.3(g). In contrast to the other categories, the Rules define "Existing Wells" as those wells "for which drilling or significant development of the well commenced before the effective date of these Rules."  *Id*. at Rules 1.1(12).  But the Rules do not establish clear production limits for Existing Wells that have no established Historic Use.

On December 8, 2004, six days after the Rules took effect, the City of Bryan began drilling Well No. 18 on its 2.7-acre tract of land and completed the well ten months later. In June 2006, the City applied for a permit to operate Well No. 18 at a production rate of 3,000 GPM.  BVGCD conditionally granted a permit authorizing production of 4,838 acre-feet annually at a rate of 3,000 GPM.  Subsequently, with no change in the amount of City land surrounding the well or the Rules' formula, the City received an identical conditional permit in April 2013.

The basis for these permits under the Rules and constitutional law is hotly disputed.  Because  no groundwater was pumped from the well before the

---

[3] The formula is: (the square of the product of the average annual production rate in gallons per minute times the District spacing requirement between wells) multiplied by pi, with the result divided by 43,560.  Rules 7.1(2).

Rules were promulgated on December 2, 2004, it could not be classified as a Historic Use Well. BVGCD granted the conditional permits under a classification of Well No. 18 as an Existing Well, although its only "existence" before the date of the Rules must have been in the form of "significant development," at least on paper. Appellants assert, not unreasonably, that Well No. 18 is a New Well; consequently, the Rule 7.1 formula would have capped the maximum allowable production on the City's 2.7-acre tract at 192 GPM. Not only did the City's well far exceed the Rules' limitation on acreage-based groundwater production for a New Well, but Fazzino's property lies within 3,003 feet of Well No. 18 and therefore within its anticipated cone of depression. The City's well may threaten to dissipate Fazzino's groundwater.

Fazzino filed a complaint with BVGCD in January 2017, asserting that Well No. 18 was not a Historic Use or Existing Well and therefore must adhere to the production limitations imposed on New Wells. He asked BVGCD to initiate proceedings to reduce Well No. 18's authorized production. After the State Office of Administrative Hearings ("SOAH") found that Fazzino was not permitted to assert such a complaint, Fazzino applied for a permit to produce 3,000 GPM from a New Well on his 26-acre property in order to "offset" the production from Well No. 18. Twice, the District advised Fazzino that his application was administratively incomplete without proof that he owned or controlled sufficient acreage—649 acres—to support production of 3,000 GPM. Fazzino acknowledged this deficiency, but he renewed the permit request to offset production from Well No. 18, and requested a variance BVGCD's spacing and production rules. Shortly afterward, BVGCD informed Fazzino both that his application had lapsed due to his failure to provide documentation of land

ownership, and that BVGCD did not grant variances.[4] The Rules provide no mechanism to obtain Board action on an administratively incomplete permit.

Stratta is a member of the Board of Directors who became concerned by what he considered unequal application of the District's Rules. He requested that the agenda for the Board's March 8, 2018 meeting include discussion of whether Well No. 18 was a New Well or an Existing Well. The President of the Board told Stratta that no such discussion would take place because it might affect pending litigation. Another board member, Russ, echoed the President's view that Well No. 18 should not be discussed. Stratta attended the March 8 meeting, but he signed in as a member of the public and submitted a "Registration Form" in his capacity as a Brazos County landowner who wished to make a public comment on an "open" agenda item. Specifically, Stratta wanted to ask the Board to include the subject of the status of Well No. 18 at its next meeting. He was prohibited from voicing this small request, however, on the rationale that "Directors" may not discuss subjects that are not on the agenda, even though "Public Comment" on "non-agenda items" was specified as an agenda item.

Lacking other recourse, Fazzino sued BVGCD and its Directors in their individual and official capacities, alleging that their unequal application of BVGCD's Rules violated his right to equal protection under the law and constituted a taking of his property interest in subsurface water beneath his

---

[4] Appellants dispute this conclusion, pointing out that the cities of Bryan and College Station, as well as Wickson Creek Special Utility District, Brazos Valley Water Supply Company, and OSR Water Supply Corporations, all maintain wells permitted to produce quantities of groundwater that would be disallowed due to inadequate tract size under Rules 6.1 and 7.1 without a variance from those rules. In fact, Appellants allege that BVGCD consistently ignores the production limitation rules for entities, like those listed, that are led or owned by, or employ, present or former Directors of BVGCD. **ROA.19; Blue Br. at 5.** Appellants, however, failed to plea specific facts—*e.g.* the dates when the wells were created, so as to establish them as "New Wells"—that would raise these allegations above being wholly conclusory. **ROA.19.**

land.  Stratta joined the suit and alleged violation of his First Amendment rights.  In response, BVGCD and its Directors filed motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  BVGCD (hereafter, collectively including its Directors) moved for dismissal under 12(b)(1) for lack of jurisdiction because:  BVGCD is an arm of the state that enjoys Eleventh Amendment sovereign immunity; Fazzino failed to exhaust state court remedies for his takings claim; and *Burford* abstention is required on the takings claim because Texas law is unsettled as to Fazzino's property interest in the groundwater.  BVGCD asserted failure to state a claim because Fazzino's property interest in groundwater is not "clearly established," his claims against the Directors are barred by qualified immunity, and Stratta's right to speak, as a Board member, is regulated by the Texas Open Meetings Act ("TOMA") and in any event not clearly established.

The district court was persuaded by all of these arguments, granted the Rule 12(b)(1) dismissal without prejudice and the Rule 12(b)(6) motion with prejudice, and entered judgment.  This appeal followed.

## STANDARD OF REVIEW

We review a district court's dismissal orders under Rules 12(b)(1) and 12(b)(6) *de novo*.  *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018); *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005); *Ysleta Del Sur Pueblo v. Laney*, 199 F.3d 281, 285 (5th Cir. 2000).  When reviewing 12(b)(1) dismissals, "we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff."  *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).  Applying the same standard as the district court, we may consider:  "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the

complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

On appeal from a Rule 12(b)(6) dismissal, we consider the allegations set forth in the complaint and any documents attached to the complaint. *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004). A plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Phillips v. City of Dallas, Tex.*, 781 F.3d 772, 775–76 (5th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). A claim is facially plausible if the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## DISCUSSION

Appellants filed suit under 42 U.S.C. § 1983 alleging that BVGCD violated Fazzino's equal protection right and has taken his property without compensation, and Stratta asserts that BVGCD violated his First Amendment right to free speech. The district court held that it lacked jurisdiction over claims against BVGCD because the district is an "arm of the state" immune from federal suits as a sovereign under the Eleventh Amendment (and its Directors are derivatively immune), (2) Fazzino's takings claim was not ripe according to *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194 (1985), and (3) the takings claim was subject to *Burford* abstention because exactly what protectible rights Fazzino has in groundwater subject to regulation by BVGCD is an unsettled question of Texas law. *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Granting the Rule 12(b)(6) motion to dismiss for failure to state a claim with prejudice, the

court held that without clearly established rights to groundwater, Fazzino's equal protection claim cannot succeed on the merits and the Directors enjoy qualified immunity. Further, Stratta failed to show that BVGCD's conduct in prohibiting him from speaking was objectively unreasonable in light of clearly established law. We disagree with each of these conclusions.

## I.

## A.

Taking the jurisdictional issues first, as we must, the district court erroneously concluded that BVGCD is an arm of the State of Texas and therefore immune from suit in federal court under the Eleventh Amendment. Texas law counsels otherwise, and analytical inconsistencies in this circuit's precedent misled the district court.

Immunity under the Eleventh Amendment extends to any state agency that is deemed an "alter ego" or an "arm of the state" such that the State itself is the "real, substantial party in interest." *Vogt v. Bd. Of Comm'rs*, 294 F.3d 684, 688–89 (5th Cir. 2002) (internal quotation marks and citations omitted). The purpose of the Eleventh Amendment is to recognize state sovereignty by shielding states, absent their consent or an explicit act of Congress, from money judgments assessed in federal court. The Eleventh Amendment does not bar suit, though, "if the political entity possesses an identity sufficiently distinct from that of the State." *Vogt,* 294 F.3d at 689 (internal quotation marks omitted). "There is no bright-line test for" ascribing Eleventh Amendment Immunity, but the inquiry is meant to determine whether, "despite the presence of a state agency as the nominal defendant," the lawsuit is "effectively against the sovereign state." *Id.*

In *Clark v. Tarrant County*, this court identified six important factors that should be weighed in this inquiry: (1) whether the state statutes and case

law view the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property. *Clark v. Tarrant Cty., Texas*, 798 F.2d 736, 744–45 (5th Cir. 1986). While no one factor is dispositive, the "second *Clark* factor—the source of the entity's funding—is the weightiest factor" because "[t]he Eleventh Amendment exists mainly to protect state treasuries." *United States ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 440 (5th Cir. 2004). We consider each of the factors.

## 1. Characterization in State Law and Case Law

"The first factor we take into account is how the state, through its constitution, laws, judicial opinions, attorney general's opinions, and other official statements, perceives the entity in question." *Hudson v. City of New Orleans*, 174 F.3d 677, 683 (5th Cir. 1999). "If the state characterizes the [entity] as an arm of the state, this factor is counted in favor of Eleventh Amendment immunity." *Id.*

Forty years ago, the Texas Supreme Court, ruling on the question whether navigation districts are state agencies or political subdivisions, clearly distinguished between the two in three ways. *Guaranty Petroleum Corp. v. Armstrong,* 609 S.W.2d 529, 531 (Tex. 1980). A political subdivision has jurisdiction over a portion of the state, while a state agency exercises its jurisdiction throughout Texas. The governing members of a political subdivision are elected or appointed by locally elected officials, but heads of state agencies are elected statewide or appointed by state officers. And political subdivisions may assess and collect taxes, a power that state agencies lack. The court concluded that "the legislature has consistently recognized

these distinctions between departments, boards or agencies on the one hand and political subdivisions on the other." *Id.* (footnote omitted). The navigation district was held to be a political subdivision.

*Guaranty Petroleum* is relevant here because the navigation district was created, exactly like BVGCD, pursuant to Art. XVI, Section 59 of the Texas Constitution and, parallel to BVGCD, the navigation district is defined as a "district" under the Texas Water Code. The Code defines a "District" as "any district or authority created under . . . Section 59, Article XVI, Texas Constitution, that has the authority to regulate the spacing of water wells, the production from water wells, or both." TEX. WATER CODE § 36.001(1). Further, the TWC defines "political subdivision" to include "a county, municipality, or other body politic or corporate of the state, including a district or authority created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, a state agency, or a nonprofit water supply corporation created under Chapter 67." TEX. WATER CODE § 36.001(15). Finally, as was the case with the navigation district, the BVGCD is run by officials appointed by county officeholders, its jurisdiction is not statewide but covers only two counties, and it may assess and collect taxes.

Despite this guidance from the Texas Supreme Court, federal case law has diverged when analyzing the *Clark* factors. To be sure, "comparisons [between like entities] cannot substitute for a careful examination of the particular entity at issue." *Sw. Bell Tel. Co. v. City of El Paso*, 243 F.3d 936, 938 (2001) (quoting *McDonald v. Board of Miss. Levee Comm'rs*, 832 F.2d 901, 908 (5th Cir. 1987)) (internal quotation marks omitted). In *Southwestern Bell*, a water improvement district unsuccessfully claimed Eleventh Amendment immunity by resting on faulty precedent—from this court. *Id.* at 938–39. This court had to explain that pursuant to *Clark,* and a line of cases preceding

No. 18-50994

*Clark,* an entity is not an arm of the state "simply because it is a creature of state law and a political subdivision of the state;" such a "conclusion would entirely obviate the arm-of-the-state analysis" such that "every entity claiming Eleventh Amendment immunity is a 'creature' of some state law." *Id.* at 939. Whether entities are created under the same law—e.g. the Texas Water Code or Article XVI, Section 59 of the Texas Constitution—cannot be the sole or sufficient factor when determining immunity. "[S]uch a test is no test at all." *Id.* at 940.

Most political subdivisions, in fact, are "*not* entitled to Eleventh Amendment immunity." *Sw. Bell,* 243 F.3d at 939. *Southwestern Bell* thoroughly criticized and rejected as fundamentally inconsistent with our earlier precedent  the cases that Appellees here rely on for their conclusion that BVGCD is an arm of the state. *See Kamani v. Port of Houston Authority,* 702 F.2d 612 (5th Cir. 1983); *Pillsbury Co. v. Port of Corpus Christi Authority,* 66 F.3d 103 (5th Cir. 1995). The *Southwestern Bell* court explained that "*Kamani* was an admiralty action in which the court stated without analysis that the Port of Houston Authority was 'a "creature of state law and a political subdivision of the State of Texas"' entitled to Eleventh Amendment immunity," and "*Pillsbury* was a breach-of-contract action in which the court held that the Port of Corpus Christi Authority was factually and legally indistinguishable from the Port of Houston Authority, and was thus entitled to immunity under *Kamani*". *Sw. Bell,* 243 F.3d at 938–40 (internal citations omitted). In light of *Southwestern Bell,* those two cases may not be relied on.[5]

---

[5] The district court's citation of *Celanese Corp. v. Coastal Water Auth.,* 475 F.Supp. 2d 623 (S.D. Tex. 2007) is also inapt. While the authority in that case (the "CWA") was created pursuant to Art. XVI, Sec. 59 of the Texas Constitution to regulate water resources, the CWA is critically distinguishable from the instant GCD because several members of its Board are appointed by the governor and confirmed by the state Senate, imparting considerable direct state influence on its operations. *Celanese,* 475 F.Supp. 2d at 634. Moreover, unlike BVGCD,

12

The district court also relied on a Texas appellate case for the proposition that an underground water conservation district is "an arm of the state created to administer the enumerated governmental powers delegated to it." *Lewis Cox & Sons, Inc. v. High Plains Underground Water Conserv. Dist. No. 1*, 538 S.W.2d 659, 662 (Tex. Civ. App.—Amarillo 1976). But the court overlooked what immediately followed: "[a]s constituted, the water district exists and functions as a governmental agency, a body politic and corporate, and stands upon the same footing as counties and other political subdivisions of the state." *Lewis Cox*, 538 S.W.2d at 662 (internal citations omitted). Other case law besides *Guaranty Petroleum* characterizes water management entities, like that in *Lewis Cox*, as "political subdivisions" that "stand upon the same footing as a county." *South Plains Lamesa R.R., Ltd. v. High Plains Underground Water Conservation Dist. No. 1*, 52 S.W.3d 770, 774 (Tex. App.—Amarillo 2001, no pet.); *see also Coates v. Hall*, 512 F.Supp.2d 770, 778 (W.D. Tex. 2007); *Sullivan v. Chastain*, 2005 WL 984348, at \*7 (W.D. Tex. Apr. 28, 2005). Counties, of course, are not entitled to Eleventh Amendment immunity. *See, e.g.*, *Crane v. State of Texas,* 759 F.2d 412, 415 (5th Cir. 1985).

The application of this factor has been unfortunately complicated by our case law, but on balance, in light of our decision in *Southwestern Bell* and state law authority, this factor suggests BVGCD is not an arm of the state.

## 2. Source of Funding

The second *Clark* factor looks at the source of BVGCD's funding. We have consistently held that the "second factor is given the greatest weight because one of the principal purposes of the Eleventh Amendment is to protect state treasuries." *Vogt*, 294 F.3d at 693; *see also Cozzo v. Tangipahoa Par.*

---

the CWA has the power to operate outside of its geographic boundaries. Act of May 17, 1967, 60th Leg., R.S., ch. 601 Section 3, Tex. Gen. Laws 1381, 1385.

*Council--President Gov't*, 279 F.3d 273, 282 (5th Cir. 2002); *Hudson*, 174 F.3d at 687 ("It bears repeating that this is the most important factor in our Eleventh Amendment arm of the state analysis."). "In assessing this second factor, we conduct inquiries into, first and most importantly, the state's liability in the event there is a judgment against the defendant, and second, the state's liability for the defendant's general debts and obligations." *Hudson*, 174 F.3d at 687. "The state's liability for a judgment is often measurable by a state's statutes regarding indemnification and assumption of debts." *Vogt*, 294 F.3d at 693. The Texas Water Code does not explicitly render the state liable for judgments against GCDs or their general debts and obligations.

GCD's are funded by locally assessed taxes and fees. TEXAS WATER CODE §§ 36.201–250. BVGCD points out that GCDs may receive grants or loans from the state, TEXAS WATER CODE §§ 36.158–61, 36.3705–374, and urges that state funds may thus be implicated in an action against the district. This observation ignores the limited statutory purposes for such infusions of state money.[6] None of these provisions permit state funds to indemnify or assume the debts of BVGCD, nor is there evidence that such grants or loans have ever been used to satisfy a judgment.

Indeed, the law speaks to satisfaction of judgments against a GCD in only one way, by an order requiring the district's board "to levy, assess, and collect taxes or assessments to pay [judgments]." TEX. WATER CODE § 36.066(b). No parallel provision references the state treasury. On the contrary, in *Edwards Aquifer Authority v. Bragg*, the court held that the Edwards Aquifer Authority ("EAA") was responsible for its permitting decisions and liable for any judgment. 421 S.W.3d 118, 126–131 (Tex. App.—

---

[6] Some provisions strictly proscribe the use of certain funds while others are largely related to startup and research costs. TEXAS WATER CODE §§ 36.158–61. The state is under no obligation to provide such funding.

San Antonio 2013, pet. denied). A judgment was later entered against the EAA for over $4.5 million. The EAA satisfied this judgment in full without any portion being paid by the state of Texas. And in *Edwards Aquifer Authority v. Day*, the State disclaimed takings liability for the actions of the EAA. 369 S.W.3d 814, 821 n.24 (Tex. 2012). In *Day*, the State took the position that a takings judgment entered against the EAA would have to be satisfied from the EAA's own coffers. *Id*.

As a last resort, BVGCD relies on a provision which states, "[t]he Texas Water Development Board, the commission, the Parks and Wildlife Department, the Texas Agricultural Extension Service, and institutions of higher education may allocate funds to carry out the objectives of this chapter." TEXAS WATER CODE § 36.160. Coupled with the statutory statement of purpose—GCDs may be created "to protect property rights, balance the conservation and development of groundwater to meet the needs of this state, and use the best available science in the conservation and development of groundwater through rules developed, adopted, and promulgated by a district"—the district argues that the Texas Legislature created a mechanism for GCDs to obtain funding in the event of an adverse judgment. *Id*. § 36.0015.

At best, this argument suggests that state agencies may volunteer to pay off a judgment debt by means of a grant.[7] But the second *Clark* factor concerns whether the state is "directly responsible for a judgment" or "indemnif[ies] the defendant." *Ex rel. Barron*, 381 F.3d at 440. Evaluated against the position that similar entities are responsible for their own judgments, this contention is virtually frivolous. *See Bragg*, 421 S.W.3d at 130–31; *Day*, 369 F.3d at 821 n.24. In the absence of any meaningful financial relationship between GCDs

---

[7] Loans could not be used to satisfy a judgment because their statutorily stipulated uses are limited to start-up expenses. TEXAS WATER CODE §§ 36.3705, 36.371–374.

and the Texas treasury, the second factor weighs heavily against finding Eleventh Amendment immunity.

### 3.  Degree of Autonomy

"The third factor we look to focuses on the degree of local autonomy the entity at issue enjoys." *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 346 (5th Cir. 1998). "'In our circuit, . . . the determination of an agency's autonomy requires analysis of the "extent of the [entity's] independent management authority" . . . [as well as] the independence of the individual commissioners' who govern the entity." *Vogt*, 294 F.3d at 694 (quoting *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 442 (5th Cir. 1985)).  Thus, we examine "the scope of the entity's authority over its day-to-day activities" and the "appointment process" of its directors.  *Id.* at 695.

The Code grants GCDs broad authority to "make and enforce rules" governing groundwater production, preservation, and usage within their geographic boundaries.  TEX. WATER CODE § 36.101(a).  Referring to this delegation, the Texas Supreme Court added that districts' "activities remain under the local electorate's supervision," and they "have little supervision beyond the local level." *Day*, 369 S.W.3d at 834.  The state's highest court has also observed that the localized GCD structure "permits the people most affected by groundwater regulation in particular areas to participate in democratic solutions to their groundwater issues." *Sipriano v. Great Spring Waters of Am., Inc.,* 1 S.W.3d 75, 80 (Tex. 1999).  BVGCD Directors are appointed by the commissioners courts of Robertson and Brazos counties, and are thus indirectly accountable to local constituents.  The state supreme court in *Guaranty Petroleum* associated this fact with the existence of an independent political subdivision.   609 S.W.2d at 531; *see Pendergrass,*

144 F.3d at 347.   This court has held that local accountability evidenced autonomy.  *McDonald v. Board of Mississippi Levee Comm'rs*, 832 F.2d 901, 907 (5th Cir. 1987).   Nevertheless, "the appointment process is given less weight than the scope of the entity's authority," *Vogt,* 294 F.3d at 695.

From another perspective, the primary responsibility of GCDs is to develop a local groundwater management plan.   TEXAS WATER CODE §§ 36.0015, 36.1071.   In creating this plan, the Texas Water Development Board and the Texas Commission on Environmental Quality "provide technical assistance" and the Water Development Board must approve the plan. §§ 36.1071–1072.  Each GCD is obligated to "review the plan annually . . . and readopt the plan with or without revisions at least once every five years." § 36.1072(e).  Notably, in *Day,* the Texas Supreme Court listed these interactions while still affirming the essentially local autonomy of GCDs.  *Day,* 369 S.W.3d at 834.

But in addition, the state auditor and Legislature are required to audit GCDs' operations periodically.  TEXAS WATER CODE §§ 36.061, 36.302.  If the auditor determines that the GCD is not appropriately managing its groundwater, the auditor may deem the GCD non-operational and the Commission on Environmental Quality must take over to ensure comprehensive management of the district.   §§ 36.302–303; *see also Guitar Holding Co., L.P. v. Hudspeth Cty. Underground Water Conserv. Dist. No. 1*, 263 S.W.3d 910, 913 (Tex. 2008) (the state auditor had deemed a GCD to be non-operational under Chapter 36).   The district court here took these relationships as an indication of significant state control.

Several Fifth Circuit cases have held, however, that audit and reporting requirements did not justify finding a lack of local autonomy.  *See Vogt*, 294 F.3d at 694–95 (holding a lack of "supervisory control over the day-to-day

operations . . . counsels against Eleventh Amendment immunity" (quotation marks omitted)); *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 321 (5th Cir. 2001) ("audit requirements are some evidence of state oversight, but they are not dispositive with respect to the issue of local control"); *McDonald*, 832 F.2d at 907 (Levee Board's obligation to make an annual report to the governor did not outweigh its predominately autonomous actions). It is not clear whether any of these cases involved a situation where, as with GCDs, the statutory oversight can and has resulted in the state's exerting control over the entity.

When these facts are considered together, the degree of local control and potential state intervention at most merely offset each other.

### 4. Scope of Activity

The fourth factor "properly centers on 'whether the entity acts for the benefit and welfare of the state as a whole or for the special advantage of local inhabitants.'" *Dallas Area Rapid Transit*, 242 F.3d at 321 (quoting *Pendergrass*, 144 F.3d at 347). "Limited territorial boundaries suggest that an agency is not an arm of the state," and "most entities that are entitled to Eleventh Amendment immunity have statewide jurisdiction." *Vogt*, 294 F.3d at 695.

This inquiry is largely geographic. In *Vogt*, the court held that even though flooding is a statewide problem, the levee board acted for the "special advantage of local inhabitants," and its powers "may be exercised only within clearly defined territorial limits." *Id.* And in *Hudson*, the court "found it highly useful to examine the geographic reach of the [entity's] powers." 174 F.3d at 690. In *Celanese,* however, it was an indication of statewide interest that the CWA was authorized to take significant actions inside and *outside* its territorial limits. 475 F.Supp.2d at 634.

BVGCD's legal boundaries are coextensive with the boundaries of Robertson and Brazos Counties.  TEX. SPECIAL DIST. LOC'L LAWS CODE § 8835.004.  Groundwater conservation districts are authorized to exercise their authority only within their territorial boundaries.  True, GCDs are expected to coordinate with each other and the Texas Water Development Board, *Day*, 369 S.W.3d at 834, but there is no evidence that these entities operate in conjunction for the "benefit and welfare of the state as a whole." *Vogt*, 294 F.3d at 695.  Appellees' contention that water conservation is "undeniably a statewide concern" is unavailing because the scope of authority rather than the scope of concern is controlling. The fourth factor cuts against BVGCD's entitlement to Eleventh Amendment immunity.

### 5.  Remaining Factors

Both parties and the district court agree that the remaining factors—the authority to sue and be sued in its own name and the right to hold and use property—weigh against granting immunity.  *See* TEX. WATER CODE §§ 36.251, 36.105.

On balance, five of the six *Clark* factors weigh against finding BVGCD is an arm of the state of Texas for which Eleventh Amendment immunity is appropriate.  Most important, funds from the Texas treasury will not be used to satisfy a judgment against the entity.  The Directors are likewise not entitled to assert such immunity.  The district court erred in dismissing the landowners' action for lack of jurisdiction on this basis.

### B.

Relying on *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the district court dismissed Fazzino's takings claims as unripe because he had neither received a final decision regarding the application of the challenged regulations nor sought

compensation for the alleged taking in state courts.  This holding has become moot after the Supreme Court overturned *Williamson County.*  In *Knick v. Twp. Of Scott,* 139 S. Ct. 2162 (2019), the Court held that "the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 *at that time.*"  *Id.* at 2168 (emphasis added). Further, "[t]he availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim."  *Id.* at 2171.  The Court then explicitly disavowed *Williamson County* and its state litigation requirement: "*Williamson County* was not just wrong.  Its reasoning was exceptionally ill founded and conflicted with much of our takings jurisprudence."  *Id.* at 2178.

Based on *Knick,* Fazzino's takings claim is ripe for adjudication because Fazzino fully pursued the administrative remedies available to him before filing this action.

## C.

The district court held Fazzino's takings claim subject to *Burford* abstention, but the following analysis will also necessarily apply to the equal protection claim that is not barred by Eleventh Amendment immunity.  "[W]e review an abstention ruling for abuse of discretion, but 'we review de novo whether the requirements of a particular abstention doctrine are satisfied.'" *Aransas Project v. Shaw,* 775 F.3d 641, 648 (5th Cir. 2014) (quoting *Romano v. Greenstein,* 721 F.3d 373, 380 (5th Cir. 2013)).  Because the exercise of discretion must fit within the specific limits prescribed by the particular abstention doctrine invoked, "[a] court necessarily abuses its discretion when it abstains outside of the doctrine's strictures."  *Webb v. B.C. Rogers Poultry,*

*Inc.*, 174 F.3d 697, 701 (5th Cir.1999); *see also Texas Ass'n of Bus. v. Earle*, 388 F.3d 515, 518 (5th Cir. 2004).

*Burford* abstention is an "extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S. Ct. 1712, 1727 (1996). "*Burford* allows a federal court to dismiss a case only if it presents 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar,' or if its adjudication in a federal forum 'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* at 726–27, 116 S. Ct. at 1726. The decision to exercise *Burford* abstention must be weighed against federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them" by Congress. *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 821, 96 S. Ct. 1236, 1248 (1976).

*Burford* itself involved a suit to enjoin the enforcement of an order of the Texas Railroad Commission, which at that time enforced a detailed regulatory scheme involving complicated oil and gas issues. *Burford,* 319 U.S. at 325–26, 63 S. Ct. at 1103. The Court admonished that federal courts should be reluctant to get involved in inherently local matters involving the management of state interests covered by a complex regulatory scheme, where the inevitable result would be "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy." *Id.* at 327, 63 S. Ct. at 1104.

Five factors govern a federal court's decision whether to abstain under *Burford*: "(1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or into local facts; (3) the importance of the state interest involved; (4) the state's need

for a coherent policy in that area; and (5) the presence of a special state forum for judicial review." *Aransas Project v. Shaw*, 775 F.3d 641, 649 (5th Cir. 2014) (quoting *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993)). The district court cited this standard correctly and found that all five factors militated in favor of abstention. We disagree.

The court had to acknowledge that because Fazzino's § 1983 claims allege constitutional violations, the first factor is satisfied in favor of federal jurisdiction. *See Romano v. Greenstein,* 721 F.3d 373, 380 (5th Cir. 2013). But it joined this factor with the second factor and found the "unsettled issue" "that state courts, including the Texas Supreme Court, have been wrestling with for years," as having to do with the applicability of Texas oil and gas common law to groundwater regulation by GCDs. As will be seen in the next section, we do not view this case in the same overgeneralized terms and find Fazzino's claims sufficiently precise under federal and state law to move forward. In the briefest terms, the Texas Supreme Court reaffirmed in *Day* that groundwater is owned in place by the surface landowner, and the EAA's (and by necessary implication, GCDs') regulatory provision affording landowners a "fair share" of groundwater confers property rights that may be enforced in takings law and under doctrines of equal protection. *Day*, 369 S.W.3d at 830. In this highly analogous context, it is no extension of state law to echo *Day*'s conclusion.[8]

Regarding the third factor, "[t]he regulation of water resources is . . . a matter of great state concern." *Sierra Club v. City of San Antonio*, 112 F.3d 789, 794 (5th Cir. 1997). In light of the severe droughts that periodically strike

---

[8] The cases cited by the district court in favor of abstention for similar issues of "unsettled state law" predate *Day* and thus are of little support. *See Williamson v. Guadalupe Cty. Groundwater Cons. Dist.,* 343 F.Supp.2d 580 (W.D. Tex. 2004); *Coates v. Hall,* 512 F.Supp.2d 770, 780 (W.D. Tex. 2007) ("[T]he Texas Supreme Court has not addressed the scope of a landowner[']s cognizable property interest in groundwater beneath their [sic] land." (quotation marks omitted)).

the state and the anticipated growth in Texas's water needs, the state's interest is only increasing.[9]  This factor favors abstention to the extent that, unlike our decisions in *Aransas Project* and *Romano*, there is no strong, countervailing federal interest.  *Aransas Project*, 775 F.3d at 651; *Romano*, 721 F.3d at 380. Nevertheless, the relief Fazzino seeks diminishes the importance of this factor.  In contrast to *Sierra Club*, in which the plaintiff sought to enjoin the EAA to reduce groundwater withdrawals, and *Wilson*, where the plaintiff sought refunds for unconstitutional rate increases on behalf of a class, Fazzino  asks that BVGCD simply apply its rules equally to landowners within its purview or provide adequate compensation to him. *Compare Sierra Club*, 112 F.3d at 798 *with Wilson*, 8 F.3d at 313.  His lawsuit therefore poses little threat to the general state interest.

The fourth factor looks at the state's need for a coherent policy in regulating groundwater.  This factor "is intended to avoid recurring and confusing federal intervention in an ongoing state scheme."  *Wilson*, 8 F.3d at 315.  But *Burford* "does not require abstention whenever there exists [complex state administrative processes], or even in all cases where there is a potential for conflict with state regulatory law or policy."  *NOPSI v. Council of City of New Orleans*, 491 U.S. 350, 362, 109 S. Ct. 2506, 2515 (1989) (quotation marks omitted).  Nor would a federal judgment here interfere with the coherence of state policy.  GCDs are designed to be decentralized and fragmentary in order to offer local control over groundwater resources.  There are roughly 100 GCDs in Texas, but nearly two-thirds of them oversee territory coextensive with a single county.  Each GCD designs and implements its own rules under a

---

[9] The Texas House Committee on Natural Resources observed, "[i]n recent years . . . severe drought coupled with a growing population has caused pressure to grow on groundwater resources."  H. Comm. on Nat. Res., Interim Rpt. 84th Leg. at 15 (Tex. Jan 2015). "What was once used mainly in times of emergency, is fast becoming the preferred method of water supply in this state." *Id.*

general legislative framework subject ultimately to the local electorate. The existence of some coordination and state oversight does not transform a decentralized system of regulation into a comprehensive one, nor does Fazzino's lawsuit threaten this regulatory scheme any more than a takings judgment secured by the Braggs against EAA. *Bragg,* 421 S.W.3d at 131. This factor weighs against abstention.

Finally, we consider the state forum for judicial review. GCD decisions are reviewed in state court. Those lawsuits are filed against local GCDs, not a state agency, and maintained in the county where the district is located. TEX. WATER CODE § 36.251. Accordingly, "there is no special state forum for judicial review." *Romano,* 721 F.3d at 380.

The BVGCD is no Texas Railroad Commission, and the federal court should not have abstained from the constitutional issues raised by Fazzino. The claims do not delve into unduly complex issues of state law, the state concerns that are implicated are not overriding in light of the remedy sought, no state law would be usurped by a federal decision, and statewide processes or regulatory regimes would not be disrupted. The district court abused its discretion in deciding to abstain under *Burford.*

## II.

Having rejected the jurisdictional objections to this litigation, we turn to the merits. The district court dismissed Fazzino's takings and equal protection claims because it believed that they rested on unsettled questions about the application of oil and gas law to the landowner's rights in the groundwater beneath his property. As we noted above, this formulation of Fazzino's claim is at too high a level of generality. BVGCD's briefing compounds this error by asserting that to adopt Fazzino's position would require the federal court to completely assimilate Texas oil and gas law to groundwater regulation. This

24

position is disavowed by Fazzino, unnecessary to adjudicate here, and amounts to a bright red herring.

It is correct, however, that Fazzino's rights as a property owner are a creature of state law. Thus, his property rights constitute whatever he has that the BVGCD may not constitutionally "take" without compensation, and they provide the baseline by which to determine whether he has been treated "unequally" by the district vis a vis the City's permit. Fortunately, Texas law is not unsettled as to the landowner's basic rights. The Texas Supreme Court plainly held in *Day* that a landowner's property rights include the ownership of groundwater in place beneath his acreage, and such ownership right is subject to takings claims. The court stated at the outset that it would decide "in this case whether land ownership includes an interest in groundwater in place that cannot be taken for public use without adequate compensation guaranteed [by the Texas Constitution]. We hold that it does." *Day,* 369 S.W.3d at 817. Further, as the court recognized, the TWC reinforces its conclusion by providing that "[n]othing in this code shall be construed as granting the authority to deprive or divest a landowner . . . of the groundwater ownership and rights described by this section." TEXAS WATER CODE § 36.002(c). With a cogent observation, the court rebuffed an argument, rather like BVGCD's argument here, that groundwater rights by their nature are "too inchoate" to merit constitutional protection: the intolerable extreme of that argument would allow a regulator to deprive the property owner of all his groundwater rights. *Day,* 369 S.W.3d at 832–33. The court instead restated that "[g]roundwater rights are property rights subject to constitutional protection, whatever difficulties may lie in determining adequate compensation for a taking." *Id*. at 833.

25

What is "unsettled" about *Day*'s interpretation of the common law and statutory rights of groundwater owners?  Indeed, it is BVGCD, not Fazzino, that would "unsettle" Texas law by asking the federal court essentially to reconsider *Day* and dramatically reduce the constitutional rights of landowners to the groundwater in place.

Neither the state Supreme Court nor the legislature is blind to differences between groundwater and oil and gas reserves that may require legal distinctions to be drawn.  *See, e.g., id*. at 830–31, 840–41.  Still, the court has explained, "[c]ommon law rules governing mineral and groundwater estates are not merely similar; they are drawn from each other or from the same source." *Coyote Lake Ranch v. City of Lubbock,* 498 S.W. 3d 53, 64 (Tex. 2016).  This common parentage led the court in *Day* to analogize the correlative rights as between landowners in common subsurface reservoirs, whether of minerals or water, as being recognized both at common law and more particularly through state regulation that  "afford[s] landowners their fair share of the groundwater beneath their property." *Day,* 369 S.W.3d at 830; *see also Elliff v. Texon Drill. Co.,* 210 S.W.2d 558, 562-63 (Tex. 1949).

Notably, the  TWC "requires groundwater districts to consider several factors in permitting groundwater production, among them the proposed use of water, the effect on the supply and other permittees, [and] a district's approved management plan." *Day,* 369 S.W.3d at 841 (citing TEXAS WATER CODE § 36.113(d)(2)–(4)).  Affording groundwater owners their fair share "must take into account factors other than surface area," the historic metric for an oil and gas owner's fair share.  *Id*.  But concerning Fazzino's takings claim, it seems highly pertinent, notwithstanding the statutory list of factors, that BVGCD opted for Rules based on spacing and production limits plus the water's proposed or historic use.  Fazzino's allegation is that by permitting the

No. 18-50994

City of Bryan to drain water from an area with a 3003 ft. radius, far outside its surface ownership and including surface area of Fazzino's property, the BVGCD has "taken" his groundwater in place without compensation. The task of the district court will be to assess, as the state supreme court did in *Day,* whether the groundwater scheme effectuated by BVGCD's Rules promulgated in December 2004 has resulted in a taking of Fazzino's interest. *Id.* at 838. That this task may be challenging is not the same as concluding it is infeasible. *See Bragg,* 421 S.W.3d at 153 (affirming judgment against the Authority for "taking" of landowners' property).

Likewise, Fazzino's equal protection claim alleges sufficiently that BVGCD unequally applied its Rules by treating municipalities, like the City of Bryan, as exempt from the production limits required by the  Rules' surface area formula while rigorously enforcing those limits against Fazzino.  The district court discussed this claim only in terms of qualified immunity for the Board, and in that respect held that Fazzino's right to equal protection, if any, was not clearly established because GCDs have broad discretionary authority in framing and implementing groundwater production rules.  The court dismissed the Board members for failure to state a claim on this basis.  In light of our rejection of BVGCD's jurisdictional objections, and the preceding discussion of Fazzino's property rights, this analysis is wanting.

A class-of-one equal protection claim is based on two factors: whether the plaintiff was "intentionally treated differently from others similarly situated," and whether there was a "rational basis" for this difference.  *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012).

*Lindquist* disavowed any precise formula to determine whether a plaintiff is similarly situated to comparators, holding instead that "the full

variety of factors that an objectively reasonable . . . decisionmaker would have found relevant" must be considered.  669 F.3d at 234.  Further, "the plaintiff's and comparators' relationships with the ordinance at issue will generally be a relevant characteristic for purposes of the similarly-situated analysis."  *Id.* Pertinent here, when creating rules, GCDs must consider "groundwater ownership and rights"; "the public interest"; and "develop rules that are fair and impartial."  TEX. WATER CODE § 36.101(a)(2)–(4).  *Day* held  that one purpose of regulating groundwater is ensuring that owners in a common reservoir receive their fair share.  *Day*, 369 S.W.3d at 840.  BVGCD implicitly accepted this position by setting groundwater production limits based on a spacing and production formula.  Thus, Fazzino's equal protection claim is not judged against the backdrop of "unsettled" questions of Texas law, but against the precise regulations enacted and enforced by BVGCD in this case.

Fazzino alleges that BVGCD intentionally treated the City differently in two ways.  First, the district mischaracterized Well No. 18 as an Existing Well although it was not completed for ten months after the Rules were promulgated.  Fazzino contends the well had to be a New Well under the district's Rules and therefore subject to its spacing and production limits.  The Texas Supreme Court rejected a similar misapplication of a GCD's regulations that deviated from the district's enabling statute in *Guitar Holding Co. v. Hudspeth Cty. Underground Water Cons. Dist. No. 1,* 263 S.W.3d 910, 917–18 (Tex. 2008).  Additionally, Fazzino alleges, BVGCD ignored its land ownership, spacing and production limits for Well No. 18 while enforcing them rigorously against him.  The results of the preference for the City's well are dramatic. Based on its land ownership, the City's well should have been limited to pumping 192 GPM, not 3000 GPM as authorized, and its annual production should have been about 315 acre-feet, not 4,838 as authorized by BVGCD.  In

28

No. 18-50994

contrast, the district agreed to permit Fazzino a New Well under Rule 7.1 for 192 GPM and 315 acre-feet per year based on his 26-acre tract.

Fazzino additionally asserts there was no rational basis for the district's differential treatment of him, and he implies the intentionality of the district's efforts based on its preference for, and the relations of its Board members to, the cities within the BVGCD. These allegations of disparity and intentional conduct are sufficient to require further development rather than dismissal on the pleadings. Because neither BVGCD nor its Board was required to respond on the merits, the substance of these allegations must be tested in discovery and further proceedings. For now, the court's Rule 12(b)(6) dismissal must be reversed as to all defendants.

## III.[10]

Stratta insufficiently pleaded that BVGCD and its Board of Directors (collectively, "Defendants") violated Stratta's First Amendment right to free speech. Given Stratta's status as a member of the Board, he was governed by the Texas Open Meetings Act ("TOMA"). As such, he did not have the same rights as the "public" under the particular circumstances. We therefore affirm the district court's judgment dismissing Stratta's First Amendment claims.

Stratta's First Amendment claim revolves around TOMA's notice requirement, TEX. GOV'T CODE ANN. § 551.041, and its notice exception provision, *id.* § 551.042. We have already upheld TOMA as a constitutional, content-neutral time, place, or manner restriction on an individual's First Amendment right. *Asgeirsson v. Abbott*, 696 F.3d 454, 462 (5th Cir. 2012).[11]

---

[10] Judge Smith and Judge Haynes join Part III in full. Judge Jones writes separately in dissent.

[11] Because free speech restrictions under TOMA do not violate the First Amendment, free speech cases that arise under TOMA are distinguishable from free speech cases that do not. As such, cases holding that a governmental body violated a member's First Amendment right to free speech for non-TOMA reasons are inapplicable here. *See, e.g., Wilson v. Hous.*

Thus, if TOMA prohibited Stratta from requesting during the Board meeting's public comment period on non-agenda items that the Board add a topic to the next meeting's agenda, then Stratta's First Amendment rights were not violated when he was barred "as a member of the public" from saying whatever he wanted at the Board meeting.

A governmental body, such as the Board, must give written notice before each meeting. *Id.* § 551.041. But such notice is not required in one instance:

> (a) If, at a meeting of a governmental body, a member of the public or of the governmental body inquires about a subject for which notice has not been given as required by this subchapter, the notice provisions of this subchapter do not apply to:
> > (1) a statement of specific factual information given in response to the inquiry; or
> > (2) a recitation of existing policy in response to the inquiry.
> (b) Any deliberation of or decision about the subject of the inquiry shall be limited to a proposal to place the subject on the agenda for a subsequent meeting.

*Id.* § 551.042. This exemption does not permit Stratta, as a member of a governmental body, to place an unnoticed issue before the Board.[12]

The exemption's "purpose is to authorize a governmental body to make a limited response to an inquiry about a subject not included on the posted notice and to prevent it from engaging in 'deliberation' or making a 'decision' about the subject matter of the inquiry." *Hays Cty. Water Planning P'ship v. Hays Cty.*, 41 S.W.3d 174, 181 (Tex. App.—Austin 2001, pet. denied); *see also* Tex. Att'y Gen. Op. No. JC-169 (2000), at 5.

---

*Cmty. Coll. Sys.*, 935 F.3d 490, 497–500 (5th Cir. 2020), *petition for reh'g filed*, Case No. 19-20237 (5th Cir. April 7, 2020) (holding that a governmental body's censure of one of its members for violating its bylaws was an unlawful restriction on the member's free speech rights).

[12] Stratta himself thought so because he signed in as a "member of the public" to make this point.

TOMA provides this exemption because "public comment sessions provide an opportunity for citizens to speak their minds on an unlimited variety of subjects" and a governmental body cannot be expected "to divine or foresee the myriad of matters its constituents wish to bring to its attention." Tex. Att'y Gen. Op. No. JC-169, at 4. Section 551.042 provides an outlet for a governmental body to address the public's concerns without violating the notice provision of § 551.041: instead, it may place the subject on the agenda for a future meeting. TEX. GOV'T CODE ANN. § 551.042; *accord id.* § 551.041 (requiring written notice before a meeting); *id.* § 551.001(4)(A) (stating that a deliberation is a type of "meeting"). It does not allow a member of a governmental body to bypass the notice requirements of TOMA by introducing a subject that has not been the subject of proper written notice during the public comment period of a meeting. Indeed, the court in *Hays County* held that a member of the governmental body in that case could not rely on § 551.042 to circumvent the notice requirement when the member "was not responding to an inquiry."[13]   41 S.W.3d at 181. Similarly, Stratta was not responding to an inquiry; he was making one. Thus, the exemption does not apply.[14]

---

[13] The dissent states that *Hays County* is distinguishable for a number of reasons. But none of those stated reasons mattered to the court's exemption determination. *See Hays Cty.*, 41 S.W.3d at 181. The only fact that mattered was whether the member of the governmental body was responding to an inquiry; he was not. *Id.* Thus, the exemption in § 551.042 did not apply. *Id.*

[14] The dissenting opinion would hold that § 551.042 permits Stratta "solely to place a proposal before the Board that the issue be taken up at a future meeting" because "[i]t is not determinative . . . whether Stratta was 'a member of the public or of the governmental body.'" Aside from the fact that Stratta presents his issue as based upon his status as a member of the public, the Texas appellate court's holding in *Hays County* does not support this interpretation of § 551.042. *See Hays Cty.*, 41 S.W.3d at 181. When evaluating issues of state law, if there is no final decision on the issue by the state's highest court, we "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Temple v. McCall*, 720 F.3d 301, 307

In his brief, Stratta acknowledges that he "intended to make a public comment requesting that the Board include the subject of the status of Well No. 18 on its next agenda," and that the "Board prevented Stratta from making the request on the basis that they feared it would violate TOMA's notice requirements."

Although, he disagreed with this analysis, he acknowledges it.  Thus, Stratta's argument is based upon his contention that he inquired as a "member of the public."  At the meeting, he signed in as a member of the public.  His brief states his appellate issue as: "Does Stratta have a clearly established right to address the board of directors as a member of the public during a period reserved for public comment on open agenda items?"  Addressing this "member of the public" contention, the answer is clearly "no."  "Member of the public" is not defined in TOMA, or any other Texas statute.  *See* TEX. GOV'T CODE ANN. § 551.001; *Austin Bulldog v. Leffingwell*, 490 S.W.3d 240, 245 (Tex. App.—Austin 2016, no pet.) (stating that no Texas statute has defined "member of the public").  Texas courts have thus looked to the plain and common meaning of the term while considering its context.  *See Leffingwell*, 490 S.W.3d at 245; *accord TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).  "When 'member of the public' is used in conjunction with an identified or identifiable group . . . —as it is here with 'governmental body'— its meaning is contextually modified to mean a person who does not belong to the identified group."  *Leffingwell*, 490 S.W.3d at 246.  Stratta is a BVGCD Board member.  He thus is not a "member of the public" when he attends a BVGCD meeting.

Stratta cannot bypass TOMA's notice requirement by attending a Board meeting as a "member of the public."  TOMA does not allow for such action

_____

(5th Cir. 2013) (internal quotation marks and citation omitted).  We thus defer to the Texas appellate court's interpretation of § 551.042.  Federal courts should be reluctant to interfere in a city council's conclusion about what Texas law means in contradiction to Texas case law.

No. 18-50994

because Stratta is a Board member.  TOMA is designed to protect the public by making open meetings, including notice of what will be discussed at the meetings, the norm.  TEX. GOV'T CODE ANN. §§ 551.002, .041.  In other words, it is designed to protect the public from Board member violations, not to allow Board members to circumvent its requirements by calling themselves "members of the public."  As a "member of the public," a panel member could appear in the town square and endorse a candidate for public office.  But as federal judges, we are barred from doing so.  *See* ADMIN. OFFICE OF U.S. COURTS, CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 5(a)(2) (2019); *see also* MODEL CODE OF JUDICIAL CONDUCT Canon 4 (AM. BAR ASS'N 2010).  Even candidates for judge are subject to limitations that "members of the public" are not.  *Cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 437 (2015).  A "member of the public" could comment on a pending criminal trial, but a juror in the case could not.  *See United States v. Albert*, 595 F.2d 283, 290 (5th Cir. 1979) (prohibiting prejudicial private communications between jurors and third persons); *Chambliss v. State*, 633 S.W.2d 678, 682 (Tex. App.—El Paso 1982), *aff'd*, 647 S.W.2d 257 (Tex. Crim. App. 1983) (stating the same).  The list goes on.  Thus, whatever Stratta's rights otherwise may be, they were overcome by his status as a Board member, and the Board correctly prevented Stratta from speaking at the meeting.[15]

In accordance with TOMA's notice requirement, the Board notified the public that the March 8, 2015, meeting would include a public comment period on open agenda items.  TEX. GOV'T CODE ANN. § 551.041.  That agenda item was limited to comments by the public, of which Stratta was not included.

---

[15] As a result, there is no need to address the qualified immunity issue.  But, assuming arguendo that the dissenting opinion is correct that there was a First Amendment violation, of course, we agree that Defendants are entitled to qualified immunity on that claim.

No. 18-50994

Stratta thus was not permitted under § 551.042 to raise a new topic as an agenda item in a future meeting during the existing meeting. Accordingly, we affirm the district court's judgment dismissing Stratta's First Amendment claims.[16]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment dismissing Stratta's First Amendment claim; **REVERSE** the dismissal of BVGCD for lack of jurisdiction, and **REVERSE and REMAND** the judgment dismissing all other claims and defendants.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

---

[16] The district court dismissed Plaintiffs' official-capacity claims against Defendants for lack of jurisdiction and their individual-capacity claims as barred by qualified immunity. However, "[w]e are free to uphold the district court's judgment on any basis that is supported by the record." *Zuspann v. Brown*, 60 F.3d 1156, 1160 (5th Cir. 1995).

No. 18-50994

EDITH H. JONES, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's conclusion that Stratta was not permitted under § 551.042(a)-(b) to inquire about a new subject for the limited purpose of placing that subject on the agenda for a subsequent meeting. These provisions specify that if "a member of the public *or* of the governmental body inquires about a subject for which notice has not been given," then "[a]ny deliberation of or decision about the subject shall be limited to a proposal to place the subject on the agenda for a subsequent meeting." (Emphasis added). The majority hold that (1) Stratta could not make an "inquiry" as a member of the governmental body, and (2) Stratta was not permitted to attend the Board meeting as a "member of the public." The plain text of the statute contravenes the first conclusion and renders the second conclusion superfluous. By limiting the response to an inquiry by a member of the governmental body to placing that subject on a subsequent meeting agenda, the statute presupposes the permissibility of such an inquiry by a member of the governmental body.[1]

---

[1] Statutory regulation of a response to an activity short of prohibition presupposes that the activity is permissible. The majority does not engage with this principle of statutory interpretation. Instead, my colleagues rely on *Hays Cty. Water Planning P'ship v. Hays Cty., Texas,* 41 S.W.3d 174 (Tex. App. 2001), for the proposition that an elected official could not rely on § 551.042 to circumvent the notice requirements when the member "was not responding to an inquiry." *Id.* at 181. The majority omits the pertinent second half of that quotation, however. In full, the court stated that the commissioner "was not responding to an inquiry by either a member of the public *or a colleague on the commissioners court*," implying once again that a member of the governmental body may make an inquiry. *Id.* In fact, the court held that "551.042 is clear and unambiguous and relates to 'inquiries' from members of the public or the governmental body." *Id.*

Furthermore, *Hays Cty.* is distinguishable on numerous grounds. The central holding of *Hays Cty.* is that a commissioner gave a "presentation" for which notice was insufficiently given. *Id.* The commissioner's remarks went far beyond getting an item placed on the agenda for a subsequent meeting. And the argument that the commissioner appeared as a member of the public was not even raised until litigation; indeed, the commissioner did not even attempt to speak during the public comment period. *Id.* at 176–77, 181. By contrast, Stratta signed into the meeting as a member of the public, attempted to speak during the public comment period, and intended only to inquire about the status of Well No. 18.

Stratta made his request at the meeting either as a member of the governmental body or as a member of the public.  Because he would have been permitted to inquire about placing the status of Well No. 18 on a future agenda in either capacity, it is not determinative under this statute whether he was "a member of the public or of the governmental body."  *Id.*  Section 551.042(a)-(b) expressly supports Stratta's strategy to place a proposal before the Board, which it was then required to debate, solely as to whether to take up this issue at a future meeting.

The purpose of TOMA is to guarantee openness in the operation of public bodies by reducing non-public discussion and deliberations and giving the public access to their activities.  The Board members here, however, are interpreting TOMA to stifle and discriminate against "open" discussion of whether an important issue should be placed on an open meeting agenda.  Yet "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995).  Stratta's pleading makes a plausible argument that TOMA was applied here in a viewpoint discriminatory fashion.  The Board members, sued in their official capacity, should be required to defend against Stratta's charge.

Nonetheless, I would affirm the district court's conclusion that the Board members are qualifiedly immune in their individual capacities from liability for any violation of Stratta's First Amendment rights.  The district court theorized they could have reasonably believed that denying him the right to speak in the public comment period of the meeting was sanctioned by TOMA. Under TOMA, a board may place items on an agenda for public discussion but may not discuss those items in advance.  TEX. GOV'T CODE ANN. § 551.041.  The district court interpreted this section to mean that if Stratta had debated with

fellow Board members whether to discuss the status of Well No. 18 in the upcoming meeting, they had foreknowledge of his views such that taking them up during the public comment session would have failed the law's notice requirement.  The court relied on a Texas Attorney General opinion stating that "the use of 'public comment' or similar term will not provide adequate notice if the governmental body is, prior to the meeting, aware or reasonably should have been aware, of specific topics to be discussed."  Op. Tex. Att'y Gen. No. JC169 (2000) at 3–4.

For purposes of qualified immunity, the court's analysis suffices. "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987) (quotation marks omitted).

In sum, I would affirm the court's grant of qualified immunity to the individual Board members but remand Stratta's claim for a First Amendment violation against the Board members in their official capacity.